## UNITED STATES DISTRICT COURT FOR

## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Christophe Bensmaine,<br><br>               Plaintiff,<br><br>    vs.<br><br>The City of New York; New York City Police Inspector Gerard Dowling, in his individual and official capacity;  New York City Police Deputy Inspector Andrew J. Hillery, in his individual and official capacity; New York City Police Officer Vincent Cascio, in his individual and official capacity; New York City Police Officer Amel Cirikiovic, in his individual and official capacity; New York City Police Officer William Dottavio, in his individual and official capacity; New York City Police Officer Gregory Johnson, in his individual and official capacity; New York City Police Officer Wendell Kornegay, in his individual and official capacity; New York City Police Officer Chajdon M. Monestine, in his individual and official capacity; New York City Police Officer Oscar Mosquera, in his individual and official capacity; New York City Police Officer Paul Olivares, in his individual and official capacity; and New York City Police Officer Amarjit Singh, in his individual and official capacity,<br><br>               Defendants. | Civil Action No.: 1:21-cv-4816<br><br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## **INTRODUCTION**

1.      This is a civil rights action arising from the unlawful arrest, assault and battery of Christophe Bensmaine ("Mr. Bensmaine"), who was at the time of the assault, innocently documenting a peaceful protest to bring attention to institutional racism and police brutality.

2.      On May 30, 2020, without any probable cause or justification, Defendants

violently arrested Mr. Bensmaine, using unreasonable and unnecessary force, causing him serious injury, humiliation, and anguish, and violating his rights under the United States Constitution, the Constitution of the State of New York, and the common law of the State of New York.

3.     Mr. Bensmaine seeks compensatory and punitive damages, injunctive and declaratory relief, and such other relief as this Court deems equitable and just.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4) as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

5.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

6.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

7.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because at least one of the Defendants resides in the Southern District. All events complained of herein took place in the Southern District.

## JURY DEMANDED

8.     Plaintiff demands a jury trial in this action on each of his claims.

## NOTICE OF CLAIM

9.      Within ninety days after the claims before this Court arose, Plaintiff filed a Noticeof Claim upon Defendant City of New York by delivering copies in the manner and to the persons designated by law to receive such claims.

10.     The Notice of Claim was in writing, sworn to by the Plaintiff, and contained the name and address of the Plaintiff, along with sufficient detail alleging the nature of the claims, the time, place, and manner by which the claims arose, and the resulting damages and injuries sustained by the Plaintiff.

11.     The City of New York failed to adjust the claims within the statutory period.

## **PARTIES**

12.     Plaintiff Christophe Bensmaine is a citizen of France and resided in the State of New York in New York County at all times relevant to this Complaint.

13.     Defendant City of New York is a municipal corporation with the right to sue and be sued. It is responsible for the policies and procedures of the New York Police Department (NYPD) and the officers and employees of the NYPD.

14.     At all times relevant to the Complaint, Inspector Gerard Dowling, ("Defendant Dowling"), Deputy Inspector Andrew J. Hillery ("Defendant Hillery"), Police Officer Vincent Cascio ("Officer Cascio"), Police Officer Amel Cirikiovich ("Officer Cirikiovich"), Police Officer William Dottavio ("Officer Dottavio"), Police Officer Gregory Johnson ("Officer Johnson"), Police Officer Chajdon M. Monestine ("Officer Monestine"), Police Officer Oscar Mosquera ("Officer Mosquera"), Police Officer Paul Olivares ("Officer Olivares"), Police Officer Amarjit Singh ("Officer Singh") were duly sworn police officers of the NYPD acting under color of state law and within the scope of their employment under the supervision of the City of New York according to municipal policy and custom. They are each sued in their

individual and official capacities.

15.     All named Defendant officers were also on duty with the NYPD on May 30, 2020 and acted on behalf of their employer the City of New York.

## FACTS

16.     This action arises from the Defendants unlawful customs, policies and practices resulting in the violation of the Plaintiff's civil rights, and the complete disregard for the civil rights of all New Yorkers.

17.     On May 30, 2020, Plaintiff Christophe Bensmaine, a citizen of France, was doing an errand in New York City when he noticed a nonviolent demonstration, prompted by the recent horrific police killing of George Floyd. The peaceful protesters were attempting to bring public attention to the widespread problems of police brutality and institutionalized racism in policing.

18.     Shortly before this event, Mr. Bensmaine had recently applied for a job with the Civilian Complaint Review Board ("CCRB"), an independent NYPD oversight board that addresses police misconduct. He was deeply disturbed by what happened to George Floyd and the racial injustices inherent in police policies and customs across the United States that were being exposed as a result.

19.     When he saw the peaceful demonstration, Mr. Bensmaine decided to  show support for the cause and participate as a civilian observer, taking photographs to document the historic event.

20.     The streets had been blocked off by the police with cones, and there were no vehicles in sight. A few police officers were present at the intersection between 7th Avenue and 47th street. The demonstration was orderly and calm.

21.     At all times relevant to this Complaint, Mr. Bensmaine was acting in an orderly and peaceful manner. The demonstration was peaceful and non-violent as well and did not give rise to the need for any police force or riot control.

22.     Nonetheless, additional police began to arrive. By about 5:25 p.m., close to fifty police officers were on site including the individual Defendants in this suit. The demonstration was still peaceful and orderly.

23.     At or about 5:27, garbled instructions were broadcast over a loudspeaker.

24.     Mr. Bensmaine did not understand the words spoken by the loudspeaker, but he generally saw that people were moving towards 47th street and he was attempting to walk withthe crowd in the direction indicated and follow any instructions he could understand.

25.     At 5:27, Mr. Bensmaine was in a crosswalk at 47th Street and 7th Avenue near Times Square. As he waited for the people in front of him to thin so he could keep moving, he took photographs.

26.     Suddenly, without warning or necessity, Defendant Hillery directed the officers named in this suit to tackle some peaceful demonstrators who were standing behind Mr. Bensmaine.

27.     Mr. Bensmaine was also knocked to the ground and  then surrounded and tackled by at least five police officers, who piled on top of  him, violently shoving his face into the pavement and grinding his knee into the asphalt. Mr. Bensmaine was terrified, his pants ripped, and he was bleeding.

28.     After some of the officers got off the pile, Mr. Bensmaine attempted to gather his wits and credit cards, which had gone flying onto the street. The officer still directly on top of him used his baton to violently shove him further into the pavement, hurting Mr.

Bensmaine's shoulder and causing lasting injuries.

29.     As the officers abused Mr. Bensmaine, several more officers stood protectively around them, creating a barricade to prevent the other demonstrators from helping or fully seeingwhat was happening.

30.     Onlookers from the sidewalk were screaming for the officers to stop hurting Mr.

Bensmaine and the other two demonstrators who the police had tackled without cause. They shouted, in sum and substance, that this was police brutality and that there was no reason forsuch violence.

31.     The officers did not stop. Instead, the individual Defendants proceeded  to violently zip tie Mr. Bensmaine's wrists together without probable cause. The zip ties were too tight and were hurting Mr. Bensmaine, who had already sustained cuts, strains, and other injuriesfrom being tackled and brutalized without reason.

32.     At some point thereafter, the officers walked Mr. Bensmaine a few meters away and undid his zip ties. Mr. Bensmaine thought the nightmare was over. But another officer roughly and tightly handcuffed him with metal handcuffs.

33.     Mr. Bensmaine was in a state of shock. He asked why he was being arrested but was given no answer.

34.     A man came up to him and began filming him and taking photographs. Mr. Bensmaine felt humiliated and scared and could not understand what was happening.

35.     The officers eventually led Mr. Bensmaine to a nearby police van.

36.     Covid-19 was raging in New York at the time, and thousands had already died. Mr. Bensmaine was particularly careful about masking and social distancing as he has a health condition that puts him at increased risk of complications from Covid-19. He was wearing

amask in consideration of other people's health and took care not to be in enclosed indoor spaces with people to avoid risk to himself.

37.     Without any consideration for Mr. Bensmaine's safety, the police herded him intothe police van with seven other people plus a driver. Several people in the van, including several Defendant police officers Doe, were not wearing masks. Mr. Bensmaine was scared for his safety.

38.     After about half an hour in the enclosed van, Mr. Bensmaine was transferred to another crowded police vehicle and taken to a police station, where he was eventually photographed and processed, had his belt, shoelaces, and belongings taken, and was put into a cell with about thirty people, again mostly without masks or protective equipment, all clustered together in a holding cell indoors.

39.     The Defendants did nothing to try to keep the prisoners socially distanced or safe even though there were strict social distancing and mask requirements in effect in New York at the time.

40.     Mr. Bensmaine's handcuffs (along with the zipties before) bruised his wrists, cutting off circulation and upon information and belief causing nerve damage. He had to ask two different officers to loosen the handcuffs. Eventually they did, but the pain and numbnessremained.

41.     At no time did any officer read Mr. Bensmaine his rights, tell him what he was being charged with or allow him a phone call.

42.     At no time did any officer provide the arrestees face masks or hand sanitizer. At no time did any officer check temperatures or attempt to provide the prisoners with enough spaceto socially distance. The hours dragged on, as the prisoners breathed in each other's

germs during a global emergency pandemic.

43.     Mr. Bensmaine had been out with his wife that evening and was just on a short errand when he encountered the peaceful demonstration and was violently arrested as he took pictures. As the hours went by, he knew his wife must be worrying about him. No one wouldgive Mr. Bensmaine any indication of how long he would be held or if he would ever be allowed to make a phone call to assure his wife, he was okay or request a lawyer.

44.     At some point after eleven p.m. at night, five and a half hours after his arrest and detention, Defendants finally released Mr. Bensmaine with an appearance ticket to return for arraignment on September 29, 2020. The ticket charged him with "disorderly conduct – obstruction of traffic."

45.     Mr. Bensmaine was terrified for weeks that he could have been exposed to Covid-19 as a result of the Defendants' reckless disregard for social distancing and masking requirements. He lives in a small apartment with his wife. He was devastated that not only was he at risk, buthe would likely be putting his wife at risk as well. He avoided going out for fear of placing more people at risk. At this time in New York City, people were dying by the thousands of Covid-19. Mr. Bensmaine was reasonably quite concerned and it caused him trauma, loss of sleep, loss of ability to participate in normal activities, and deep anxiety.

46.     At all times herein, the individual Defendants had no cause, let alone probable cause or reasonable suspicion, to arrest, exercise excessive force, charge or detain Mr. Bensmaine. Their actions were based on bad-faith and malice and carried out under the direction of Inspector Hillary, who has a long history of lawsuits alleging false arrests and excessive force.

47.     The conduct of the individual Defendants in restraining, arresting, tackling,

injuring, threatening and prosecuting Mr. Bensmaine proximately caused physical, emotional,and financial injury to the Plaintiff as well as serious physical and emotional pain and suffering, mental anguish, shock, fright, physical pain, humiliation, embarrassment, and deprivation of constitutionally protected rights.

48.    Mr. Bensmaine had to engage the services of both a civil rights attorney and an immigration attorney to attempt to defend himself. Upon information and belief, the District Attorney's office declined to prosecute Mr. Bensmaine's case and/or were never provided with the charges from the NYPD. In any event, they indicated to Mr. Bensmaine's counsel that they have no intention of prosecuting the charge.

49.    However, Defendants refuse to provide Mr. Bensmaine with any kind  of assurance or official record indicating that the charges are dropped and sealed, causing Mr. Bensmaine great stress and worry about the impact that any pending charges on his record might have on his job search and on his immigration and professional standing.

50.    Moreover, the false arrest was a highly publicized event. Onlookers took videos which were posted on YouTube and at least one German TV channel, displaying  Mr. Bensmaine's violent arrest. These videos have been seen by at least 28,000 people as of today. Being publicly arrested  in this way itself damages Mr. Bensmaine's reputation even if the charges are sealed.

51.    Mr. Bensmaine is a high-level professional, currently on a personal leave from working for the French IRS as a public servant in positions requiring the strictest ethical and moral reputation. He is also actively looking for similar work in the United States.

52.    It is extremely damaging to his reputation and career to have an unresolved arrest for "disorderly conduct" on his record. The false charges impact his job prospects both in the United States and his security clearances and professional reputation in France.

53.     Mr. Bensmaine and his wife are worried that the charges will also impact their immigration status, which is tied to his wife's work with a prominent U.S. corporation, or at the very least, will bring professional embarrassment and negatively impact her professional reputation as well as his and thus harm the couple's livelihood and immigration status.

54.     At all times relevant to these events, Defendants acted intentionally, willfully, maliciously, negligently and with reckless disregard for Mr. Bensmaine's rights as well as his safety, and physical and mental well-being. They did so to suppress  and unlawfully punish speech related to racial justice and police misconduct, and to harm Plaintiff as well as our most cherished democratic freedoms for their own gain.

55.     The actions of the individual Defendants, as set forth herein, were the result of the failure of the City of New York's police department to properly train, supervise and discipline its officers, including Defendants Dowling and Hillery and Officers Cascio, Cirikiovich, Dottavio, Johnson, Korengay, Monestine, Mosquera, Olivares, and Singh, and all the other individual Police Officers Doe involved in the events described herein.

56.     This failure to train, supervise and discipline is a consequence of the deliberate policies and practices of the Defendant City of New York and its NYPD. These policies and practices are in part responsible for the unconstitutional, deliberate, malicious,  negligent, careless, and intentional actions of the individual Defendants.

57.     At all relevant times herein, Defendant City of New York, acting through its NYPD, developed, implemented, enforced, encouraged, and sanctioned *de facto* policies, practices, and or customs exhibiting deliberate indifference to the constitutional rights of non-violent protesters and bystanders, including Mr. Bensmaine.

58.     Defendants' policies and actions were carried out willingly, knowingly and with

the specific intent to deprive Plaintiff and others similarly situated of constitutional, civil, and human rights secured by the U.S. Constitution, the New York Constitution, and the commonlaws of New York.

59.    Defendant's violations of Plaintiff's rights were directly and proximately caused by policies, practices and customs developed, implemented, enforced, sanctioned  and encouraged by Defendant New York City including, the failure to: (a) adequately supervise and train its officers and agents, including Defendants, thereby failing to adequately discourage widespread known constitutional violations by its officers; (b) to properly and  adequately monitor  and discipline its officers, including Defendants; and (c) to adequately investigate citizen complaints of police misconduct, instead tolerating and even rewarding officers such as, but not limited to, Defendant Hillery for his long history of bad behavior.

60.    Upon information and belief, Defendant New York City, acting through  its NYPD, developed, implemented, enforced, encouraged, and sanctioned a *de facto*  policy, practice and/or custom of unlawfully interfering with and/or arresting without probable cause individuals who exercise their rights under the First Amendment, particularly those who were demonstrating against police misconduct.

61.    The abuse Plaintiff suffered is part of a larger pattern and practice of NYPD's intentional policy of unlawfully violating protesters rights in the wake of the George  Floyd police killing, which in turn arises out of decades of willful aggressive policies to shut down and terrorize protesters whose politics may conflict with those widely held by the NYPD or thosewho seek to influence them.

62.    On January 14, 2021, the Attorney General for the State of New York filed a sixty-nine-page complaint suing the Defendant City of New York for widespread and

intentional policies leading to massive civil rights violations against hundreds of protesters at protests(including the May 30, 2020 demonstration) that took place in the weeks and months afterGeorge Floyd's death.

63.     The allegations set forth in that Complaint, Case 1:21-cv-00322 are incorporated by reference into this one. As the Attorney General highlighted, Defendant New York City has been on notice many times over that their policies and practices are leading to consistent civil rights violations and physical and mental harm to innocent civilians, and they willfully refused to adequately address these risks. For example, since 2003, the CCRB substantiated 730 excessive force allegations against NYPD officers who were still employed with the NYPD as of June 2020, including, upon information and belief, substantiated complaints against Defendant Defendant Hillery.

64.     The Attorney General pointed out that the City of New York's choice to deploy the Strategic Response Group ("SRG") to respond to peaceful protests like the May 30, 2020 demonstration indicates gross negligence at the very least. "SRG is a specialized unit trained to respond to major disorder control events, such as riots, and engage in counter-terrorism efforts. SRG officers are trained to use crowd control techniques and strategies, such as kettling, mass arrests, and the deployment of bicycle squads to perform disorder control. SRG routinely relied on these tactics when responding to the peaceful Protests. As the Protests unfolded, Defendants also knew about, but allowed, the unlawful practices to continue." *People of the State of New York v. City of New York et al,* Case 1:21-cv-00322 ¶¶62-65.

65.     Upon information and belief, Defendants Dowling and Hillery are in charge of the SRG response team sent to the May 30, 2020 demonstration where Mr. Bensmaine was violently arrested and harmed.

66.     Defendant Hillery's reputation for excessive use of force, false arrests and

police misconduct is also so well established that he has been dubbed "New York's most sued cop" having been named in over fifteen lawsuits, resulting in more than $700,000 worth of settlement payments.

67.     Upon information and belief, despite a series of news articles and proceedings bringing attention to Defendant Hillery's (and other actors') repeated alleged misconduct, Defendant City of New York has failed to take corrective action to prevent further harm to innocent New Yorkers. This failure directly led to the violations of Mr. Bensmaine's civil rights and bodily safety on May 30, 2020.

68.     Placing Defendants Dowling, Hillery and the SRG in command of the police response to the peaceful demonstration against police brutality and racism on May 30, 2020, just five days after the killing of George Floyd, shows reckless indifference (at best) to the constitutional rights ofthe demonstrators, as well as to their physical and emotional safety and the safety of civilian bystanders.

69.     In this context, such a choice shocks the conscience and indicates a deliberate andintentional plan by Defendant City of New York to suppress political speech on this race-based issue.

70.     Upon information and belief, in addition to attempting to unlawfully silence speech, Defendants used the protest as an opportunity to meet unlawful arrest quotas by roundingup and arresting masses of innocent demonstrators without probable cause.

71.     At the very least, the failures and intentional actions documented above and in theAttorney General's complaint, incorporated by reference, predictably led to constitutional violations on May 30, 2020, and were the direct and proximate cause of Mr. Bensmaine's injuries.

72.    As NYPD's Chief of Patrol in October 2020 stated about the Protests: "[i]f [the officers] [saw] something that they perceived to be a violation of the law, they arrested that person, not realizing that protests are allowed—that peaceful protests are allowed." She further admitted that "we had officers that did things that never should have been done; that's not in alignment with what we stand for as agency."

73.    What happened to Mr. Bensmaine should never have been done. To the extent that the assaults and batteries and false arrest were in alignment with anything that the NYPD stands for, such a stance must be stricken down and remedied by this Court in the interests of allthat we hold dear for the protection of one and all.

## CAUSES OF ACTION

### FIRST CLAIM

**42 U.S.C. § 1983 for Violations of the First and Fourteenth AmendmentsFirst Amendment Claims against All Defendants**

74.    Plaintiff repeats and realleges by reference paragraphs "1" through "73" as if fullyset forth herein.

75.    The First Amendment protects the free expression of protected speech and the rights to peaceably assemble and associate. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006). It also protects the right to gather information, including the right to record and observe police activity. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 783 (1978); *Higginbotham v. City of New York*, 105 F. Supp. 3d369, 379 (S.D.N.Y. 2015).

76.    Defendants collectively and individually implemented, enforced, encouraged, and sanctioned and/or ratified policies, practices, and/or customs of punishing Mr. Bensmaine's conduct protected by  the First Amendment in retaliation for, and in order to

prevent him from further exercising those rights, including through: (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properly and adequately monitor and discipline  NYPD Officers; and (c) the overt and tacit encouragement and sanctioning of and the failure to rectify, the NYPD's practice of chilling conduct protected by the First Amendment at the Protests.

77.     The challenged policies, practices, and customs include, but are not limited to, thefollowing unconstitutional practices:

a.   restricting peaceful assemblies and the expression of protected speech; and

b.   restricting the ability of legal observers or civilian observers such as Plaintiff to monitor, photograph and report on police conduct.

78.     Multiple additional lawsuits have been filed by journalists and photographers verifying in sworn pleadings that the NYPD and its officers specifically targeted people who were documenting the police brutality protests in May, June and July of 2020.

79.     As a result of these policies, practices and customs, Plaintiff was deprived of his liberty, property, and constitutional rights and experienced bodily injury, pain, and suffering.

80.     Defendants were repeatedly placed on notice that NYPD Officers' training and supervision were inadequate and likely to result in constitutional violations based on complaints of First Amendment violations at large-scale protests within the last two decades, as documentedin reports, lawsuits, and CCRB complaints, and the incorporated complaint by the Attorney General of the United States.

81.     By their conduct, as described herein, and acting under color of state law to deprive the Plaintiff of his rights to freedom of speech, assembly, and association under the

First and Fourteenth Amendments, the individual Defendants are liable for violation of 42 U.S.C. § 1983 which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

82.     The individual Defendants have violated Plaintiff's First Amendment rights to assembly, speech and association by unlawfully denying his right to assemble lawfully in public fora; terminating his lawful assembly with others; subjecting him to false arrest and illegal excessive force; maliciously prosecuting him to deter the exercise of his First Amendment rights;and interfering with and/or terminating his lawful protected activities of observing and documenting police conduct in a public forum. Defendants' actions were taken in retaliation for Plaintiff exercising his First Amendment rights.

83.     Because of the Defendants' actions, Plaintiff suffered violations of his First and Fourteenth Amendment rights to free speech, assembly, and association. Plaintiff has credible fear and  apprehension that he will, again, be subject to similar or new and worse unlawful acts by Defendants done for the purpose of limiting and preventing his First Amendment protective activities.

84.     In grossly violating his rights, the Defendants acted with deliberate indifference tothe First Amendment rights of the Plaintiff and many thousands of other New Yorkers. Defendant's acts and omissions directly and proximately chilled and thus violated the First Amendment Rights of the Plaintiff and countless others.

85.     As a direct and proximate result of the Defendants' unlawful actions, Plaintiff suffered damages including, physical, mental, and emotional injury and pain, mental anguish, suffering, humiliation, trauma, and embarrassment

## SECOND CLAIM

## 42 U.S.C. § 1983 for Violations of the Fourth and Fourteenth

**AmendmentsExcessive Force against All Defendants**

86.     Plaintiff repeats and realleges by reference paragraphs "1" through "86" as if fullyset forth herein.

87.     The Fourth and Fourteenth Amendments protect individuals against the unreasonable use of police force, both before and during seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Edrei v. Maguire*, 892 F.3d 525, 540 (2d Cir. 2018). These amendments are binding on municipalities. *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010).

88.     Defendants implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs of using various forms of excessive force when policing the Protests in violation of the Fourth and Fourteenth Amendments, including through (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properlyand adequately monitor and discipline NYPD Officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify the NYPD's practice of using excessive force beforeand at the Protests.

89.     The challenged policies, practices, and customs include, but are not limited to, thefollowing unconstitutional practices inflicted on the Plaintiff by the individual officers named above acting on their own and collectively pursuant to municipal policy and direction:

    a.  Indiscriminately tackling and roughly shoving to the ground and restraining peaceful, cooperative and law-abiding civilians (including but not limited to Plaintiff) without probable cause;

    b.  using potentially deadly force against Plaintiff, and others, such as piling five or six large officers on top of such peaceful civilians, using the baton to shove them roughly into the asphalt, causing difficulty breathing and physical injury, in response to peaceful protesters and non-lethal threats;

c. using unsafe police riot control tactics to corral, trap, and unlawfully arrest, detain, and use excessive force against perceived participants (such as Plaintiff) in peaceful assemblies without adequate notice or opportunity to disperse; and

d. using unreasonably tight plastic zip-ties and metal handcuffs to effect mass arrests without adequate monitoring of or response to complaints by detainees (such as Plaintiff), resulting in the loss of circulation, nerve damage, and other injuries to detainees' wrists and arms.

90.     As a result of these policies, practices and customs, Plaintiff was deprived of his liberty, property, and constitutional rights and experienced bodily injury, pain, and suffering.

91.     Defendants were repeatedly on notice that NYPD Officers' training and supervision were inadequate and likely to result in constitutional violations based on hundreds of incidents of excessive force at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints.

92.     Defendants acted with deliberate indifference to the Fourth and Fourteenth Amendment rights of Plaintiff and all peaceful protestors. Defendants' acts and omissions have directly and proximately violated Plaintiff's Fourth and Fourteenth Amendment Rights.

93.     By their conduct, as described herein, and acting under color of state law to deprive the Plaintiff of his right to be free from excessive force during an arrest as required by the Fourth and Fourteenth Amendments, each of the individual and municipal Defendants are liable for violation of 42 U.S.C. § 1983 which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

94.      As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered, and will continue to suffer, damages including, physical, mental, and emotional injury

and pain, mental anguish, suffering, humiliation, and embarrassment.

95.     There is a real and immediate threat that the NYPD will continue to chill the protected speech of New York Residents, including Plaintiff, in the future through  such excessive force because the Protests continue, the NYPD has repeatedly used such tactics at the Protests, and large-scale protests in New York City are likely to re-occur in the future.

96.     Plaintiff and other New York Residents or persons finding themselves in New York have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's  policy, practice, and/or custom of the unconstitutional chilling of protected speech; interference with the right to monitor and record police activity; and the policies, practices, and/or customs that have directly and proximately caused such abuses.

### THIRD CLAIM

#### 42 U.S.C. § 1983 for Violations of the Fourth and Fourteenth AmendmentUnlawful Seizure against All Defendants

97.     Plaintiff repeats and realleges by reference paragraphs "1" through "96" as if fullyset forth herein.

98.     The Fourth Amendment protect individuals from unlawful detention and arrest. *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003).

99.     Defendants implemented, enforced, encouraged sanctioned, and/or ratified policies, practices, and/or customs of effectuating unlawful detentions and arrests against protest attendees in violation of the Fourth Amendment, including but not limited through (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properlyand adequately monitor and discipline NYPD Officers; and (c) the overt and tacit encouragementand sanctioning of, and the failure to rectify, the NYPD's practice of

making unlawful detentions and arrests before and at the Protests and other prior demonstrations.

100.    The policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

a.  failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to  effecting arrests in connection with peaceful assemblies (such as occurred against Plaintiff);

b.  arresting people (such as Plaintiff) without ensuring that  constitutionally sufficient notice and opportunity to disperse were given;

c.  arresting groups of protesters (such as Plaintiff) without probable cause;

d.  using unnecessary riot control tactics (such as occurred against Plaintiff) to corral and trap participants in peaceful assemblies or bystanders nearby.

101.    As a result of these policies, practices and customs, Plaintiff was deprived of his liberty, property, and constitutional rights and experienced bodily injury, pain, and suffering.

102.    Defendants repeatedly were placed on notice that NYPD Officers' training and supervision is inadequate and likely to result in constitutional violations based on hundreds of incidents of false arrest at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints.

103.     Defendants acted with deliberate indifference to the Fourth Amendment rights of Plaintiff. Defendant's acts and omissions directly and proximately violated the Fourth Amendment Rights of Plaintiff and countless others.

104.    By their conduct, as described herein, and acting under color of state law to

deprive the Plaintiff of his right to be free from unreasonable searches and seizures and arrest without reasonable suspicion or probable cause as required by the Fourth and Fourteenth Amendments, Defendants are liable for violation of 42 U.S.C. § 1983 which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

105.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered, and will continue to suffer, damages including, physical, mental, and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

106.    There is a real and immediate threat that the NYPD will continue to unlawfully detain and arrest New York Residents (including Plaintiff) in the future because as the protests continue, the NYPD has repeatedly made such unlawful detentions and arrests at the peaceful protests, and large-scale protests in New York City are likely to re-occur in the future.

107.    Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of unconstitutional and unlawful arrest and detention as well asthe policies, practices and/or customs that have directly and proximately caused such abuses.

## FOURTH CLAIM

### 42 U.S.C. § 1983 for Violations of the Fifth and Fourteenth AmendmentUnlawful Seizure against All Defendants

108.    Plaintiff repeats and realleges by reference paragraphs "1" through "107" as if fully set forth herein.

109.    The acts of the Defendants, under color of state law, in arresting Plaintiff without cause and without reading him his rights, subduing speech and physically assaulting Plaintiff were racially motivated to stop public outcry over racism in police policies, undertaken without lawful justification, taken with deliberate indifference to Plaintiff's rights

and safety, and were designed to, and did, cause specific and serious bodily harm, pain and

suffering to Plaintiff in violation of his Constitutional rights as guaranteed by the Fifth and

Fourteenth Amendments of the United States Constitution. Through these actions, Defendants

are liable for violation of 42

U.S.C. § 1983 which prohibits the deprivation under color of state law  of rights secured under

the United States Constitution.

110.    As a consequence of the Defendants' actions, Plaintiff suffered violations of his

due process rights under the Fifth and Fourteenth Amendments and Plaintiff has credible

fearand apprehension that he will, again, be subject to similar unlawful acts by Defendants.

111.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff

suffered, and will continue to suffer, damages including, physical, mental, and emotional injury

and pain, mental anguish, suffering, humiliation and embarrassment.

## FIFTH CLAIM

### *Monell* Claim against New York City

112.    Plaintiff repeats and realleges by reference paragraphs "1" through "111" as if

fully set forth herein.

113.    To the extent not already articulated in the above claims, Defendant City of

New York is responsible for all the deprivations of rights set forth above.

114.    At all relevant times herein, Defendant City of New York, acting through its

NYPD, developed, implemented, enforced, encouraged, and sanctioned *de facto* policies,

practices, and/or customs exhibiting deliberate indifference to the Plaintiff's constitutional

rights which caused the violation of such rights.

115.    Defendants' unlawful actions were done willfully, knowingly and with  the

specific intent to deprive Plaintiff of his constitutional rights under the First, Fourth, Fifth and

Fourteenth Amendments to the U.S. Constitution along with his rights under state and common law.

116.    The constitutional and civil rights abuses and violations by Defendant  City of New York, through the actions of its Police Department and all named Defendants, were and are  directly  and  proximately  caused  by  policies,  practices  and/or  customs  developed, implemented,  enforced,  encouraged  and  sanctioned  by  Defendant  City  of  New  York, including the failure: (a)to adequately supervise and train its officers and agents, including the  Defendants,  therebyfailing to adequately discourage further constitutional violations on the part of its police officers; (b) to properly and adequately monitor and discipline its officers, including Defendants; and (c) to adequately and properly investigate citizen complaints of police misconduct, and, instead, actsof misconduct were tolerated by the City of New York.

117.    Upon information and belief, Defendant City of New York has, acting through its NYPD, developed, implemented, enforced, encouraged, and sanctioned a *de facto* policy practice, and custom of  unlawfully interfering with and arresting, without reasonable suspicion or  probable  cause,  individuals  such  as  Plaintiff  who  exercise  their  rights  under  the  First Amendment by engaging in monitoring and documenting police activities and/or misconduct.

118.    Defendants' unlawful actions were done willfully, knowingly and with  the specific intent to deprive Plaintiff of his constitutional rights under the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution.

119.    Defendants acted with deliberate indifference to the constitutional rights of Plaintiff. As a direct and proximate result of the acts as stated herein by each of the Defendants, the Plaintiff's constitutional rights have been violated which has caused him to suffer physical, mental  and  emotional  injury  and  pain,  mental  anguish,  suffering,  humiliation   and embarrassment.

120.    Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices, and! or customs which have directly and proximately caused such constitutional abuses.

## SIXTH CLAIM

**New York State Constitution – Article I, § 12 (Unlawful Seizure) against All Defendants**

121. Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "120" as if fully set forth herein.

122. NYPD Officers seized Plaintiff without the reasonable articulable suspicion of criminality required by Section 12 of Article 1 of the New York State Constitution.

123.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced encouraged and/or sanctioned by Defendant City of New York.

124.    As a result of these abuses, Plaintiff was deprived of his liberty, property, and constitutional rights.

125.    The acts of Defendants, acting under color of law, in subjecting Plaintiff to unlawful search and seizure, and arrest was done without reasonable suspicion or probable cause and was designed to, and did cause, specific and serious mental and bodily harm, pain, and suffering to the Plaintiff in violation of his rights guaranteed by Article I, Section 12 of the Constitution of the State of New York.

126.    The foregoing acts and conduct of Defendants were a direct and proximate cause of injury and damage to Plaintiff and violated his rights as guaranteed by the Constitution of the State of New York.

127.    In unlawfully seizing Plaintiff while he peacefully walked through a crosswalk, NYPD Officers were acting within the scope of their employment. Defendant City of New York,as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## SEVENTH CLAIM

### New York State Constitution – Article I, § 11 (Equal Protection) against All Defendants

128. Plaintiff incorporates by reference the allegations set forth in paragraphsnumbered "1" through "127" as if fully set forth herein.

129. The acts of Defendants, acting under color of law, in arresting Plaintiff and in physically assaulting Plaintiff were racially motivated to stop public outcry against racist nationwide police policies and patterns and was done without lawful justification, and was designed to and did cause specific and serious bodily harm, pain and suffering to the Plaintiff in violation of his Constitutional rights to equal protection as guaranteed by Article I, Section II of the Constitution of the State of New York.

130.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by Defendants.

131.    In suppressing and retaliating against speech, expression, and press at the Protests,NYPD Officers were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior.*

## SEVENTH CLAIM

### New York State Constitution – Article I, § 8 (Freedom of Press) against All Defendants

132.    Plaintiff incorporates by reference the allegations set forth in  paragraphs numbered "1" through "131" as if fully set forth herein.

133.    While Plaintiff was engaged in speech, expressive conduct, or press reporting –all rights secured by the New York State Constitution – NYPD Officers infringed upon such constitutionally-protected activity and retaliated against him by assaulting, battering, and/or detaining them.

134.    Civilian observers such as Plaintiff engaged in fact gathering during the protest were not threatening public safety or interfering with lawful police action. Yet, without legal justification, NYPD Officers used physical force and detention to prevent and deter Plaintifffrom monitoring, recording, and reporting on police activity at the May 30, 2020, protest.

135.    NYPD Officers' acts would chill a reasonable person, and did in fact chill Plaintiff, from continuing to participate in, observe, record, and report on the Protests.

136.    By attempting to prevent and retaliate against Plaintiff for participating in, observing, recording, and reporting on the Protests, NYPD Officers deprived Plaintiff of rights secured by Section 8 of Article 1 of the New York State Constitution.

137.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by Defendant. In suppressing and retaliating against speech, expression, and press at the Protests, NYPD Officers were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible forthe wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

**EIGHTH CLAIM**

**Assault under the Laws of the State of New York against All
Defendants**

138.    Plaintiff incorporates by reference the allegations set forth in  paragraphs numbered "1" through "137" as if fully set forth herein.

139.    As a result of the foregoing, Plaintiff was placed in apprehension of imminent harmful and offensive bodily contact without privilege or consent.

140.    As a result of NYPD Officers' tortious conduct, Plaintiff suffered physical injury and mental anguish.

141.    NYPD Officers assaulted Plaintiff at the protest while acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

**NINTH CLAIM**

**Battery under the Laws of the State of New York against All
Defendants**

142.    Plaintiff incorporates by reference the allegations set forth in  paragraphs numbered "1" through "141" as if fully set forth herein.

143.    As alleged above, NYPD Officers made offensive and violent contact with Plaintiff without privilege or consent.

144.    As a result of NYPD Officers' tortious contact, Plaintiff suffered physical injury and mental anguish.

145.    NYPD Officers battered Plaintiff while acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officers, is responsible forthe wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

**TENTH CLAIM**

**False Arrest and Imprisonment under the Laws of the State of New York (against all)**

146.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "145" as if fully set forth herein.

147.    NYPD Officers unlawfully seized Plaintiff, wrongfully detaining and confininghim without privilege or consent.

148.    NYPD Officers also falsely imprisoned Plaintiff.

149.    Defendants are responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

**ELEVENTH CLAIM**

**Negligence under the Laws of the State of New York (against all)**

150.    Plaintiff incorporates by reference the allegations set forth in paragraphs numbered "1" through "149" as if fully set forth herein.

151.    NYPD Officers owed a special duty of care to Plaintiff, both because they injured him or witnessed him being injured by other NYPD Officers, and because there was a deadly pandemic outbreak which put him at risk of serious harm when they enclosed him in indoor spaces without ensuring that everyone was masked and socially distanced despite executive orders and public health directives ordering these measures as crucial. Defendants violated this special duty by failing to intervene to prevent injury, and by failing to seek and/or provide medical aid and, ensure protective measures such as social distancing and masks.

152.    NYPD Officers' negligent failure to intervene and seek and/or provide  medical aid Plaintiff after injuring him during the violent and senseless arrest caused Plaintiff further injury.

153.    NYPD Officers did not have discretion to deny medical aid to Plaintiff after

they assaulted and battered him. The NYPD Patrol Guide Procedure Number 221-02 requires NYPD Officers to "ensure [that an injured or ill] subject receives proper medical attention" and to "[e]nsure subject receives immediate medical attention and provide first aid, if appropriate and properly trained, if subject is having difficulty breathing or demonstrates potentially life- threatening symptoms or injuries."

154.    Moreover, after taking him into custody, NYPD officers had a duty to ensure that Plaintiff was not traumatized by being denied the protection of executive public health directives ensuring that he would be able to maintain social distancing and that people in close proximity to him, including his arresting officers, would be masked to avoid the potential spread of deadly disease.

155.    As a direct and proximate cause of these policies, Plaintiff suffered physical, emotional and mental trauma.

156.    Defendants are responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## TWELFTH CLAIM

### Negligent Supervision, Retention and Training against All Defendants

157.    Plaintiff incorporates by reference the allegations set forth in  paragraphs numbered "1" through "156" as if fully set forth herein.

158.    Defendants failed to use reasonable care in the training and supervision of the NYPD Officers who assaulted, battered, falsely imprisoned, and/or negligently injured Plaintiff during the protest.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court:

A. Declare that Defendants' conduct violated the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution and Plaintiff's rights under the New York State Constitution and state common law in the manners alleged herein, upon consideration of the evidence adduced at trial or otherwise;

B. Issue a mandatory injunction requiring that Defendants possessing any arrest information arising from the actions complained of herein shall collect and deliver to the Plaintiff's attorney all such records and expunge or delete all such information pertinent to Plaintiff from their records;

C. Enjoin Defendants and all their officers, employees, agents and anyone acting in concert with Defendants, from implementing, applying, or taking any action whatsoever under its unconstitutional policies or practices of employing excessive force, false arrests and retaliatory tactics against peaceful protesters in New York and requiring Defendants to take all affirmative steps, including changing policies, conducting training and undergoing monitoring, among others, to ensure that Defendants achieve compliance with all legal protections governing peaceful protestors and prevent NYPD from engaging in conduct to unlawfully disrupt, disperse, interfere with or prevent the lawful First Amendment activities explained of herein of any peaceful protestor again;

D. Award Plaintiff compensatory damages against the Defendants, including, but not limited to any emotional distress, compensable costs related to criminal defense consultations and representation or immigration consultations arising from these events, and any other compensatory damages as permitted by law and according to proof at trial;

E. Award Plaintiff punitive damages;

F. Award attorneys' fees pursuant to 42 U.S.C. § 1988;

G. Award costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and,

H. Award such other and further relief as this Court may deem appropriate and equitable,

including injunctive and declaratory relief as may be required in the interests of justice.

Dated: August 25, 2021                            Respectfully Submitted,

/s/ *Sujata S. Gibson*

Sujata S. Gibson, Esq.
**Gibson Law Firm,
PLLC** 407 N Cayuga St,
Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125/Fax: (607) 238-4689
sujata@gibsonfirm.law

Attorneys for Plaintiff